IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KBC BANK, N.V. and SANTANDER
BANK, N.A.,

                         Appellants,                    OPINION AND ORDER

   v.

                                                        16-cv-266-wmc
                                                        16-cv-468-wmc

CAPITOL LAKES, INC.,

                         Appellee.

Appellants KBC Bank, N.V. and Santander Bank, N.A., seek review of two orders of the bankruptcy court entered in debtor and appellee Capitol Lakes, Inc.'s Chapter 11 petition. First, the debtor's banks, as the two sole, secured creditors, appeal the bankruptcy court's order setting the value of the secured creditors' claims at $36 million. Second, the banks challenge the bankruptcy court's order that confirmed the Fifth Amended Reorganization Plan for several reasons. The court previously consolidated these two appeals, issued a brief stay of the order confirming the plan, and expedited briefing. ('468 dkt. #10.) For the reasons that follow, the court will affirm both orders.

BACKGROUND

**A. Facts**

The debtor Capitol Lakes is a non-profit corporation that owns and operates a continuing care retirement community ("CCRC") in Madison, Wisconsin. The sole member of Capitol Lakes is Pacific Retirement Services, Inc. ("PRS"), an Oregon non-profit corporation. PRS manages Capitol Lakes through individuals employed by Pacific

Retirement Management Services, Inc. ("PRMS"), a for-profit Oregon corporation that is wholly owned by PRS.

PRS acquired Capitol Lakes from Meriter Health Services, Inc., in November 2007, in a transaction that involved:  PRS assuming certain pre-existing bond debt; the issuance of new bond debt; PRS procuring letters of credit from the banks to provide credit support for the bonds; and the purchase from KBC of an interest rate swap to hedge the interest rate exposure associated with the variable nature of rates of certain of the bonds.  Under the terms of this transaction, the banks secured first priority liens on substantially all of Capitol Lakes' assets.   In addition, the Indenture Trustee holds approximately $3.799 million in a debt service reserve fund ("DSRF") for the benefit of the banks.

### B.  Procedural Posture

On January 29, 2016, Capitol Lakes filed its Chapter 11 bankruptcy petition.  On February 3, Capitol Lakes filed a motion asking the bankruptcy court to set a value for the collateral securing appellants KBC Bank, N.V. and Santander Bank, N.A.'s claims. The court held a hearing on the motion on April 6 and 7.  Capitol Lakes relied on the expert opinion of Neil J. Beaton in seeking a valuation of $32 million.  The banks' experts David Fields and Ed Smith valued the banks' collateral at $50.25 million and between $47.3 and $49.6 million, respectively.  On April 7, the bankruptcy court entered an order valuing the bank collateral at $36 million.

The banks then opted to elect application of 11 U.S.C. § 1111(b)(2) to their claims, which entitled the banks to a payment stream that:  (a) is in the full amount of

the bank claims; and (b) has a net present value as of the effective date of any plan of reorganization equal to the value of the bank collateral, set at $36 million.

Capitol Lakes filed various iterations of a plan for reorganization. Material to the banks' challenges, the Third Amended Plan was filed on April 17. That Plan divided the claims into various classes, including the banks' secured claims, other general unsecured creditor claims, and the residents' claims. (Banks' Ex. 4 at ¶ 3.2.) On April 20, the bankruptcy court issued an order approving the disclosure statement and scheduling a hearing to consider confirmation of that plan for June 22. Capitol Lakes distributed the Third Amended Plan and the disclosure statement to creditors, and then solicited votes to accept it. The plan was overwhelmingly accepted by residents and the general unsecured creditors, with 98.12% of the residents and 99.84% of the holders of general unsecured claims voting in favor of the plan. (Appellee's Br. ('468 dkt. #19) 25 & 25 n.8.)

Before the confirmation hearing, however, Capitol Lakes filed Fourth and Fifth Amended Plans, both without filing or distributing an amended disclosure, apparently because in particular, both amended plans only changed the treatment of the banks' secured claims. Material to this appeal, the Fifth Amended Plan provided that the bank claims would be treated as fully secured and paid by the debtor over the course of 12 years with annual payments of $1.674 million in years 1-12 (2017-2028) and a balloon payment of $33,720,000 in 2028. (5th Am. Plan ('468 dkt. #2-2).)

In connection with the confirmation hearing, the parties provided expert opinions on the appropriate interest / discount rate for purposes of determining whether the net present value of the payment stream under the reorganization plan complied with the

3

requirements of § 1129(b).  Capitol Lakes' expert, Timothy J. Dragelin, opined that the appropriate rate was 4.65%.  The banks' expert, Keith Bierman, opined that the appropriate rate was 8.37%.

On June 22 and 23, the bankruptcy court held a confirmation hearing, and on June 27, the bankruptcy court issued its opinion and entered the order confirming the Fifth Amended Plan as "supplemented and modified specifically during the hearing on confirmation and augmented by the representations and promises made by the debtor or its counsel during argument." (6/27/16 Bankr. Op. & Order ('468 dkt. #2-1) 13.)

## OPINION

### I.  Standard of Review

This court reviews a bankruptcy court's findings of fact deferentially for clear error, while legal conclusions are reviewed *de novo*.  *See In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007) (citing Fed. R. Bankr. P. 8013 and *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998)).  "Special deference must be accorded to credibility determinations" in particular, "'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief of what is said.'"  *Bonnett*, 895 F.2d at 1157 (quoting *Anderson,* 470 U.S. at 575).  "Absent an abuse of discretion, an appellate court should not attempt to redetermine the credibility of witnesses."  *Id.* (citing *In re Pearson Bros. Co.*, 787 F.2d 1157, 1162 (7th Cir. 1986)).

As for factual findings generally, appellate courts are admonished not to overturn the bankruptcy court simply because the appellate court may have decided the case

differently.  *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000).  Although there may be evidence to support it, a factual finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

The banks raise several challenges to the bankruptcy court's order confirming the reorganization plan.  They also object to the court's valuation of the banks collateral at $36 million.  Each challenge is addressed in turn below.

## II. Order Confirming Reorganization Plan

### A.  Satisfaction of § 1111(b) Election

As previously explained, because the banks elected repayment of their secured claim under 11 U.S.C. § 1111(b), they are entitled to

> receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

11 U.S.C. § 1129(B)(2)(A)(i)(II).  The banks do not dispute that the plan purports to provide deferred cash payments totaling the full of amount of their claim over time.  Instead, they contend that the bankruptcy court erred in two core ways in finding that the banks will receive at least the value of the bank collateral.

*First*, the banks purport to challenge the bankruptcy court's math, albeit in a roundabout way, by arguing that the only way the present value of the proposed payment stream equals the $36 million valuation of their collateral is if the $3.799 million DSRF account is included as a payment.  (Appellants' Br. ('468 dkt. #16) 30-32 & 32 n.11.)

5

As an initial matter, there is no mystery in how the bankruptcy court treated the $3.799 million DSRF account in its calculation -- that account in included as part of the banks' total secured claim of $57.6 million but not the present value of their collateral measured at $36 million.  (6/27/16 Op. & Order ('468 dkt. #2-1) 1; *see also id*. at 12; *see also* 6/23/16 Hr'g Tr. at 451-52.)[1]  Indeed, the Plan itself is clear on this point:  Section 4.9 of the Plan provides that "the Banks shall receive deferred cash payments equal to the total amount of the Allowed Bank 1111(b) Claim, less the total amount of Cash held in the Debtors' debt service reserve accounts that may be drawn by the Banks on or after the Effective Date."  (5th Am. Plan ('468 dkt. #2-2) 20.)

Still, the banks argue that this amount cannot be included in the payment stream because these funds are not property of the estate.  (Appellants' Br. ('468 dkt. #16) 32 n.11.)  Tellingly, the banks offer no explanation or support for this position.  As the debtor explained, "[b]ecause the DSRF was reserved for payment of the Banks' claims under the Bond Documents, it is appropriate for those funds to be counted as the first payment toward the reduction of the Banks' claims."  (Appellee's Br. ('468 dkt. #19) 32.)  The court agrees with the debtor that there is no reason why these funds cannot be used to satisfy the amounts owed.  Moreover, the banks fail to explain how they are prejudiced from this payment source.

*Second*, the banks challenge the bankruptcy court's adoption of a 4.65% interest / discount rate, as recommended by the debtor's expert Mr. Dragelin.  The bankruptcy

---

[1] The bankruptcy judge also made clear that the banks' total secured claim will be reduced by the DSRF, but that amount was not factored into the value of the banks' collateral.  (6/27/16 Op. & Order ('468 dkt. #2-1) 2.)

court found his opinion "more persuasive" than that offered by the banks' expert Mr. Biermann, who proposed an 8.37% interest rate.  (6/27/16 Op. & Order ('468 dkt. #2-1) 9.)

Even if this did not amount, at least in part, to a credibility determination, to which this court must defer, the framework for determining interest rates is governed by the United States Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2000) (plurality op.).  The parties' experts both applied this framework, and Judge Martin relied on it in his opinion.  *Till* directs that courts first look to the national prime rate:

> Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default.

*Id.* at 478-79.  From there, the Supreme Court explains that courts must adjust the prime rate based on certain factors:

> Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id.* at 479.  The Court further explained that "starting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the "liquidity of the collateral market")[.]  *Id.*

7

While *Till* concerned a Chapter 13 cramdown, the framework seems every bit as appropriate, and indeed has been applied, in the Chapter 11 context.  In Chapter 11 cases, courts have considered whether an efficient market rate exists before applying the *Till* factors, picking up on a footnote in *Till*.  *See Till*, 541 U.S. at 477 n.14 ("it might make sense to ask what rate an efficient market would produce" in a Chapter 11 case); *see also In re K & K Holdings, LLC*, No. 12 B 23916, 2014 WL 585953, at *13 (Bankr. N.D. Ill. Feb. 13, 2014) (explaining methodology in Chapter 11 cramdown cases also involve "a two-step analysis, asking first whether an efficient market exists for this type of loan"); *In re GAC Storage El Monte, LLC*, 489 B.R. 747, 764 (Bankr. N.D. Ill. 2013) (following the *Till* footnote by considering market rate in context of Chapter 11 cramdown).

The banks nevertheless lodge three objections to the bankruptcy court's interest rate selection of 4.65%.[2]  The banks first point out that the debtor's expert acknowledged that the prime rate itself accounts for a degree of risk of default.  Mr. Dragelin, however, simply acknowledged, as did the Supreme Court in *Till*, that "the prime rate [is] not a risk free [rate] but just a relatively low risk rate."  (6/23/16 Hr'g Tr. at 368.)  The court sees no error in Dragelin's approach, or at least, the court finds no basis for upsetting Bankruptcy Judge Martin's factual finding that Dragelin's approach was sound, especially since Dragelin adjusted the prime rate upward based on the *Till* factors, after concluding that additional risk factors were not accounted for in the prime rate itself.

---

[2] Consistent with the parties' briefs, the court refers to the rate as a 4.65% interest rate or discount rate.  As described below, the rate adopted is actually a "floating" prime rate, plus 1.15%. Both of the experts assumed a prime rate of 3.5%, thus calculated an interest rate of 4.65%, at least at the outset.

Next, the banks argue that a 4.65% interest rate fails to reflect the market rate. At first glance, this would appear to be the banks' strongest argument. In particular, the banks rely on a market survey conducted by their expert, Mr. Bierman, concerning the "terms and interest rates at which various lenders active in the senior living financing markets were lending." (Appellants' Br. ('468 dkt. #16) 42.) The banks represent that "the average interest rate in the CCRC industry for the very best borrowers ranged from 5 to 6%." (*Id.*) If one looks at Bierman's report, however, the market "survey" consisted of five banks, of which only *two* provided information about their interest rates. (Bierman Rept. (Banks' Ex. 14) at 14.) If anything, this limited "survey" proves that there was no reliable, set market rate to which the court should have turned. Indeed, as Bierman acknowledges in his report, "Because there is not an efficient market for the loan proposed by the Debtor under the Plan, [he] followed the guidance provided by the Supreme Court in *Till*." (*Id.* at 13.) Moreover, to the extent this kind of data might be considered as part of the *Till* analysis in situations where there is no efficient market, the narrow, incomplete data underlying Bierman's survey undermines any weight that might be given to the 4.35% to 6.25% range cited in his report. For this reason, the court can find no error in Judge Martin's rejection of this analysis.[3]

As for their third and final critique, the banks argue that the bankruptcy court erred in failing to make any adjustment of the rate based on the 13-year duration of the payment stream. As described above, one factor to be considered under *Till* is certainly the "duration and feasibility of the reorganization plan." 541 U.S. at 479. The

---

[3] Even if it did, the 4.65% interest rate arrived at by Judge Martin falls within that range, if still below the 5% floor urged by the banks.

bankruptcy court, however, accounted for duration at least in part by adopting Mr. Dragelin's proposed interest rate of a *floating* prime rate plus 1.15%.  (6/27/16 Op. & Order ('468 dkt. #2-1) 2.)   Perhaps if the bankruptcy court found the feasibility requirement to be a close call relative to other markets or the economy as a whole, a further adjustment for duration would have been warranted, but that was not the case, and there is no contrary evidence to conclude that this factual finding was clearly erroneous.

In the end, the bankruptcy court here adopted the analysis of the debtors' expert, explaining that, "[i]n the contest of experts[,] Mr. Dragelin's testimony regarding the appropriate interest rate adjustment in this case was much . . . more persuasive and more firmly based."  (6/27/16 Op. & Order ('468 dkt. #2-1) 2.)   The court finds no error in the court's adoption of that testimony, nor of its use of the *Till* framework.  Accordingly, it finds no clear error in the factual findings underlying the bankruptcy court's adoption of a 4.65% interest rate.

### B. Feasibility

Next, the banks challenge the bankruptcy court's finding that the plan is "feasible" under 11 U.S.C. § 1129(a)(11).  That provision requires that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

To demonstrate that a plan is feasible, "the bankruptcy court need not find that it is guaranteed to succeed; [o]nly a reasonable assurance of commercial viability is required."

*In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 962 (7th Cir. 1997), *rev'd on other grounds*, *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999); *see also* 2 Robert E. Ginsburg & Robert D. Martin, *Ginsburg & Martin on Bankruptcy*, § 13.13 J (5th ed. 2014) ("The court should look for a reasonable expectation of success based upon the evidence of improvement of the debtor's positions"). Moreover, it is the debtor's burden to demonstrate feasibility. *See In re Gentry*, 807 F.3d 1222, 1226 (10th Cir. 2015) ("Debtors have the burden of proof by a preponderance of the evidence.").

As an initial matter, the banks complain about language in the bankruptcy court's opinion that "the banks failed to prove that the balloon payment was unlikely to be made." (6/27/16 Op. & Order ('468 dkt. #2-1) 6.) The banks argue this language suggests the bankruptcy court erroneously shifted the burden of proof on feasibility to them. (Appellants' Br. ('468 Dkt. #14) 34-36.) Critically, however, that court found earlier in the same paragraph that "*Capitol met its burden* in establishing that the proposed plan is feasible." (*Id.* (emphasis added).) Moreover, in describing the standard for proving feasibility, the court acknowledged that it is the proponent's burden. (*Id.*) Read in context, therefore, the court agrees with the debtor that the language cited by the banks simply means that the banks failed to *rebut* the debtor's proof that the plan, and specifically the balloon payment, was feasible. Accordingly, the court finds no error in the bankruptcy court's articulation of the legal standard or application of that standard.

More fundamentally, the banks challenge the bankruptcy court's feasibility finding on the basis that the court failed to make the necessary factual findings, citing Federal Rule of Civil Procedure 52(a). While this court agrees that the bankruptcy court's factual findings in its written opinion are less detailed than they might be, the

11

court's findings are more than adequate to approve the plan since the bankruptcy court principally relied on the following facts: (1) the banks maintained a security interest in the property; (2) the debtors' market position and manageable, ongoing debt service; and (3) the debtors' showing that the property would *at least* maintain its value.

The purpose of Rule 52(a) is "to inform the appellate court of the basis of the decision and to permit effective appellate review." *In re Chi., M. & St. P. & Pac. R.R.*, 3 F.3d 200, 208 (7th Cir. 1993). Here, Judge Martin's finding that the plan achieved a "classic adjustment of debt that is central to the concept of reorganization in bankruptcy" by reducing the debtor's "debt service obligations from $4.5M-$5M annually to $1.7M annually" (6/27/16 Op. & Order ('468 dkt. #2-1) 6), forms a sufficient basis for review.[4]   Indeed, despite the banks' objection, there is ample evidence in the record to support the $36 million dollar valuation as discussed in more detail below. Accordingly, the only question is to the likelihood of the debtors' succeeding as a going concern and maintaining the value of that collateral. As to its going concern, the court credited the debtor's projections, strong market position, and the ongoing commitment of PRS to provide management and other services. (6/27/16 Op. & Order ('468 dkt. #2-1) 6, 10-11; *see also* Appellee's Br. ('468 dkt. #19) 47-49.) There was also ample evidence to find the banks' underlying capital would at least maintain its volume. In particular, Judge Martin noted that the plan required the debtor to spend $500,000 annually on maintaining and improving that property.

---

[4] The court also agrees with debtor that if the banks believed Judge Martin's factual findings were inadequate, they could have moved for additional findings pursuant to Fed. R. Bankr. P. 7052(b). (Appellee's Br. ('468 dkt. #19) 52.)

While the banks challenge the debtors' projections, arguing that the April 2016 projections relied on to determine the value of the banks' collateral were deflated, whereas the June 2016 projections were unfairly inflated to support a feasibility finding. Even acknowledging that there may have been some gamesmanship on the part of the debtor in crafting the projections, the less favorable April 2016 projections provide a sufficient basis for finding that the projected value of the collateral in 2028 would be sufficient to satisfy the balloon payment.  Similarly, there is a sufficient basis in this record for the court to find the repayment plan is feasible since it rests on the court finding the opinion of the debtor's experts more credible based on the record as a whole.

### C. Fairness Challenges

As for a broader fairness challenge, the banks posit three related arguments:  (1) the plan is not fair and reasonable as required under § 1129(b)(1); (2) it was not proposed in good faith as required under § 1129(a)(3); and (3) it does not satisfy the requirement of § 1129(a)(10) that at least one impaired class vote to accept the plan. The crux of the banks' concern is that they are the only entities bearing any downside with respect to the plan.  Specifically, the banks point out that the unsecured credits are made whole under the plan, with the only hitch being a three-month delay in receipt of the second payment, while the change to the resident agreements is actually an *improvement*, removing the residents from the impaired class category altogether.  But neither of these arguments undercut the unsecured creditors and residents' respective positions as "impaired" classes.  *See, e.g., In re Woodbrook Assocs.*, 19 F.3d 312, 321 (7th Cir. 1994) ("A class is impaired if there is any alteration of a creditor's rights, no matter

13

how minor." (internal citation and quotation marks omitted)); *In re Greenwood Point, LP*, 445 B.R. 885, 906 (Bankr. S.D. Ind. 2011) ("The Seventh Circuit has stated that the 'standard for impairment is very lenient and 'any alteration of the rights constitutes impairment even if the value of the rights is enhanced.'" (quoting *In re Wabash Valley Power Assoc., Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995)).  Here, there is no dispute that the unsecured creditors' payments are delayed under the plan, and the residency agreements, and specifically the timing of refund payments, were modified.  That is enough.  *See id.*

Moreover, the banks' challenge only has merit if the plan is not feasible.  More specifically, if the $33 million balloon payment is not feasible, then the banks, as the only secured creditors, will not be made whole, while the other groups of affected parties will.  Because the court has already found that the bankruptcy court did not err in finding the plan feasible, none of the banks' three, related fairness arguments have merit.  As such, the court sees no basis to second-guess the bankruptcy court's finding that the plan was fair and reasonable.

### D. Absolute Priority Rule

The parties also devote a significant amount of paper to discussing whether the banks have standing to challenge the plan under 11 U.S.C. § 1129(b)(2)(B) -- a provision concerning whether a plan is fair and equitable with respect to "a class of *unsecured* claims." (emphasis added.)  That subsection provides:

> (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

14

. . .

(B) With respect to a class of unsecured claims--

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

As described above, § 1129(b)(2)(A) concerns whether a plan is fair and equitable with respect to *secured* creditors. In making the § 1111(b) election, the banks opted to be treated as fully *secured* creditors, and therefore § 1129(b)(2)(B) has *no* application to their claims.

Still, the banks persist by directing the court to decision from the Seventh Circuit: *In re Castleton Plaza, LP*, 707 F.3d 821 (7th Cir. 2013). In this bankruptcy appeal, the court considered in the context of an objection under § 1129(b)(2)(B), "whether an entity investor can evade the competitive process by arranging for the new value to be contributed by (and the new equity to go to) an 'insider,' as 11 U.S.C. § 101(31) defines that term." 707 F.3d at 821. Relying on the Supreme Court's decision in *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), the court answered the question in the negative, holding that "[a]n impaired

lender who objects to *any* plan that leaves insiders holding equity is entitled to the benefit of competition." *Id.* at 824.[5]

The court rejects the applicability of this opinion for two reasons. *First*, the secured lender in *In re Castelton Plaza* was also the holder of distinct, *unsecured* debt, and therefore the application of § 1129(b)(2)(B) arguably makes sense. *See* 707 F.3d at 822 ("About a year later Castelton proposed a plan of reorganization under which $300,000 of EL-SNPR's roughly $10 million secured debt would be paid out and the balance written down to roughly $8.2 million, with the difference treated as unsecured."); *see also id.* ("Since the plan pays EL-SNPR less than its contractual entitlement, § 1129(b)(2)(B)(ii)" applies.). While in the 2014 opinion the court rejected the debtor's argument that "competition is unnecessary because . . . the *secured lender*[] will be paid in full and is not 'impaired'" 561 F. App'x at 562, that language must be interpreted in light of the secured lender's positon as a holder of unsecured debt as well.

*Second*, and more critically, the holding in the *Castelton* opinion concerned the role of competition in ensuring that a junior creditor, and specifically, one that is an "insider," like the spouse of the debtor in *Castelton*, not receive or retain an interest in the property because of that junior claim. This case does not concern an insider receiving or retaining any such interest. The court agrees with Judge Martin that PSR received no interest in any of the property covered by the Chapter 11 plan. Rather, all PSR received was "the

---

[5] The banks also cite to a 2014 opinion involving the same bankruptcy petition. *In re Castelton Plaza, LP*, No. 14-1735, 561 F. App'x 561 (7th Cir. June 23, 2014). In that opinion, the Seventh Circuit affirmed the bankruptcy court's dismissal of the bankruptcy petition based on the debtor's failure to propose a plan that complied with the Seventh Circuit's mandate. 561 Fed. Appx. at 562.

opportunity to continue to serve a retirement community by its treatment under the plan." (6/27/16 Op. & Order ('468 dkt. #2-1) 8.) There is no evidence, for example, that PSR received equity as part of a new investment outside a competitive bid process. *In re Castelton*, 707 F.3d at 822.

### E.  Procedural Challenges

Finally, with respect to the confirmation order, the banks posit two procedural challenges. *First*, the banks take issue with so-called oral "modifications" to the plan made by the debtor during the confirmation hearing. In asserting this challenge, the banks point to § 1127(a), which requires all modifications of a plan to be "filed." From, this the banks argue, reasonably enough, that modifications must be in writing. (Appellant's Br. ('468 dkt. #16) 71-72.)

In its opinion confirming that plan, the bankruptcy court described the plan "as supplemented by the representation of Capitol's counsel." (6/27/16 Op. & Order ('468 dkt. #2-1) 2.) Those representations, however, do not constitute modifications of the plan under § 1127(a). Specifically, the Fifth Amended Plan provides for the retention of the banks' liens. (5th Am. Plan ('468 dkt. #2-2) § 4.9.) Instead, counsel's representations simply concerned challenging *the credit agreement* in a manner wholly consistent with the plan. Specifically, counsel for the debtor addressed *the banks'* concerns regarding the means by which liens granted under the plan would be perfected, agreeing to modify the terms of the credit agreement to be consistent with the plan. (Appellee's Br. ('468 dkt. #19) 67-68 (citing 6/23/16 Hr'g Tr. at 450).) As such, the

court rejects any challenge to the order confirming the Fifth Amended Plan based on this change.

*Second*, the banks challenge the debtors' failure to disclose the Fifth Amended Plan.   If the banks had voted to accept a prior version of the plan, and then debtor had modified the plan without providing an additional disclosure, the banks' argument might have some merit, but that is not the case here.   Instead, the banks *rejected* the Third Amended Plan, and, therefore, the banks lack standing to challenge the Fifth Amended Plan on the basis that it was not disclosed.   *See* Fed. R. Bankr. P. 3019(a) (providing that modifications "shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan"); *In re Sweetwater*, 57 B.R. 354, 358 (D. Utah 1985) ("Citicorp did not vote to accept the Plan. Citicorp rejected the Plan as proposed and has rejected it as modified. Additional disclosure would not have affected Citicorp's vote. Citicorp was not directly affected by the Bankruptcy Court's ruling that the requirements of Rule 3019 had been satisfied and has no standing to appeal from that ruling.").

In other words, the banks were in no way prejudiced by the lack of disclosure, or at least the court can find no error in the bankruptcy court's determination that the disclosures were adequate for a party who had already objected to the plan, modification or no.   Regardless, there is no dispute that the banks were aware of the various modifications of the plan, since all of which were filed in the bankruptcy docket.

## III.  Valuation Order

As raised in the No. 16-cv-266 appeal, the banks also challenge the bankruptcy court's order determining that the fair market value of the bank collateral is $36 million.

In particular, the banks argue that the debtor's expert, Mr. Beaton, failed to appreciate that the debtor intended to operate as an income-producing assert, and therefore Beaton's valuation approach was improper and the bankruptcy court's reliance on that approach constitutes legal error.  The problem with the banks' criticism, however, is that Beaton properly considered Capital Lakes as a going concern in determining its fair market value in light of two accepted methodologies, the income approach and the market approach.  (Appellee's Br. ('468 dkt. #19) 73-75.)  In light of Beaton's generally accepted methodology, coupled with the bankruptcy court's finding that Beaton was a "more credible appraiser of this type of property in this circumstance" (4/6/16 Hr'g Tr. at 240), the court affirms the bankruptcy court's order on the valuation of the banks' collateral as well.[6]

## ORDER

IT IS ORDERED that the decisions of the bankruptcy court in the two above-captioned cases are AFFIRMED.

Entered this 27th day of September, 2016.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[6] The banks also lob, in a cursory fashion, discrete challenges to the bankruptcy court's treatment of their respective experts (Appellant's Br. ('468 dkt. #16) 83-84), but the court finds none rise to the level of clear error.